SNEED, J.,
delivered the opinion of the Court.
The prisoner appeals in error from the judgment of the Circuit Court of the county of Gibson, upon a general verdict of guilty under an indictment containing two counts, the first an accusation of grand larceny, and the second charging the crime of receiving stolen goods of greater value than ten dollars. The verdict is in the form following: “The said Lewis Nice is guilty in manner and form as charged in the indictment, and the jury, upon their oath, do further say, for the offense aforesaid, the said Lewis Nice shall undergo confinement in the Penitentiary of the State for the period of five years.”
The property so alleged to have been stolen or felo-niously received, was a pocket-book belonging to Dr. McGhee, containing United States treasury notes and National Bank notes of various denominations, set out and described in the indictment, and two money-orders described in the indictment as “one piece of paper having thereon a money-order for twenty-five dollars, of the value of twenty-five dollars; and one other piece of paper having thereon a money-order for twenty dollars, of the value of twenty dollars. The value of the pocketbook is stated in the indictment at one dollar, and its contents at about two hundred dollars in the aggregate. The facts are, that Dr. McGhee had employed the prisoner, and one Green Davidson, both colored men, to remove his furniture from one room to another, in the town of Trenton. While the furniture was being re *217 moved, Dr. McGhee left the house and walked down into the town. In a short time he missed his pocketbook, containing the valuables charged to have been stolen, and remembering that he had left the pocketbook secreted between the mattresses upon which he had slept the night before, he returned to the house and found that the mattresses and other furniture had been removed, and the pocket-book could nowhere be found. At once suspecting that oné of his two employes had taken his pocket-book, he obtained a search warrant and searched their houses, but without finding the lost property. He then determined to examine each of his employes separately, and to this end he took the prisoner into a private room. His interview with the prisoner is thus narrated by Dr. McGhee in his testimony: “I said to him, now Nice, if you will tell me all about my money, I will not prosecute you, and I will give you five dollars.” The prisoner then- remarked to him, “If you will go Avith me, I will.” They then went off together, and went into the lot where the prisoner lives, or one adjoining, and the prisoner dug into the ground and dug up a tin box which had in it one hundred and fifty-five dollars in money and the two money-orders, one for twenty-five dollars and the other for twenty dollars, and he then dug a little farther and produced the pocket-book, and handed it to the Avitness with the money and orders, and remarked, this money and the pocket-book Green Davidson gave me, requesting that I should take care of it for him. I did so, but I did not know Avkere he got the money.” To the introduction of this con *218 fession, the prisoner, by his counsel objected; but the objection was disallowed by the court, and the confession went to the jury. The identity of the pocket-book was established, but its value was not proven. The witness believed that the money so found was his property, but he could not swear positively, and only thought the money was his from the worn condition of one of the bills of twenty dollars. The money had all been disposed of before the trial, and could not be produced upon the demand of the prisoner. In describing the money, the witness stated that he had some twenties, some tens, and some five dollar bills; some of which he was satisfied was what is commonly called greenbacks, and some what was called National Bank currency. Whether the twenties were all greenbacks, or some National Bank currency, or whether some of the tens were greenbacks, or some National, or whether some of the fives were greenbacks or some National Bank currency, he could not tell. There were some twenty dollar bills of greenback in the money he obtained from the prisoner that were a little worn and old. That he remembered very well to have had one in his pocket-book of a similar character, and “it looked like his;” but to say any of them were his, he could not, from any private mark. He had received them all at the value they purported to be, believing that they were his, and he passed off the twenty dollar bill as currency as twenty dollars. The two orders he considered of value to the amount they called for, and a portion of one of them had already been paid to him.” The prisoner’s counsel called for the production of the orders, *219 and that they be read to the jury, the witness having the orders in his hands. The court refused to permit the orders to be read to the jury, to which ruling the prisoner excepted. The prisoner introduced Mrs. McGhee as a witness in his behalf. She testified that the prisoner and Green Davidson were both at her house that morning, and were removing the furniture from the usual sleeping room to another room; but before they had completed the job, Green Davidson left and went to Mrs. Seat’s, the adjoining, lot. An inquiry was made as to why he had gone, and the reply was that he had gone for water. The witness remarked that there was plenty of water there. He returned, however, and the two continued the removal of the furniture, which was finished just before dinner, and the. prisoner left first. Before he left, something was said about paying him, to which he replied, it made no difference. Then Green Davidson left, and both had left before Dr. McGhee returned to his dinner. In the course of the testimony of this witness, she stated that Dr. McGhee said, that when the mattresses were moved, Green Davidson was in another room. To this statement there was no exception by the prisoner, and there was no ruling upon it by his Honor, the Circuit Judge.
As already stated, there were two counts in the indictment: the first charging the offense of larceny; and the second, that of receiving stolen goods, knowing them to be stolen, with intent to deprive the true owner thereof. The count for receiving stolen goods concludes with the words “contrary to the peace and dignity of the State;” but the count for larceny has no spell con- *220 elusion. The prisoner demanded to be tried upon the count for receiving stolen goods, and called upon the Attorney t General to enter a nolle pros, as to the other count, which was refused, and the prisoner was tried upon both counts. The verdict, as will be seen, was a general verdict of guilty, as charged in the indictment. The charge of the Court, after defining the distinction between grand and petit larceny, and correctly charging the law as applicable to those offenses, and after giving the prisoner the full benefit of the doctrine of reasonable doubt, and all other defenses merely technical, proceeds as follows: “If you find from the proof that he stole the goods or money, as stated above, and that they were of the value of ten dollars or under, he would be guilty of petit larceny. If he received the goods or money, knowing them at the time to have been stolen, he would be guilty of a crime, the penalty of which ■was the same as if he had stolen them himself. There are two counts in the indictment. You may find him guilty on one, and acquit him on the other, or you may find a general verdict of guilty.”
Upon this record, a number of questions are made, and upon each the opinion of the Court is requested. And premising that, for some of the alleged errors of the law, the cause must be remanded for a new trial, we forbear from criticizing the facts, and proceed at once to consider the errors of law as they arise upon the record.
An indictment in this State, that does not conclude “against the peace and dignity of the State,” is a nullity. It is a positive injunction of the Constitution *221 itself, that such shall be tbe conclusion of every indictment. It is, therefore, a matter that can not be affected by legislation, and a defect that can not be ignored by the courts. An indictment without these words is not an accusation of crime, and not an indictment in the sense of the Constitution. No conviction upon such an indictment could be permitted to stand ; and a prisoner can not waive his rights in this, respect, as it is the imperative mandate of the Constitution, that all crimes shall be prosecuted by presentment or indictment, and that all indictments shall conclude, “against the peace and dignity of the State.” By tbe statute, 37 Hen., 8, c. 8, the words vi et armis, viz: baeulis, eultellis, areubus et sagittis, or such other like, shall not, of necessity, be put or comprised in any inquisition or indictment. And “exceptions to indictments omitting these words have often been answered by this Court by quoting this old statute.” Tipton v. The State, 2 Yer., 542; Taylor v. The State, 6 Hum., 285. And by our Code, the words “contrary to the form of the statute,” and other words merely formal, are dispensed with, such as are not essential in the description of the offense: Code, 5115, et vid. 2 King’s Dig., § 4950: But the conclusion, “against the peace and dignity of the State,” can not be dispensed with.
It is held that each count in an indictment must be a complete indictment in itself. This, we think, refers to the description of the offense, and not to the formal conclusion. And it seems that the good and bad counts may, by apt reference and averment, become so incorporated in each other, that the principal count- and the matter bor *222 rowed for the other, may constitute together a complete accusation: The State v. Lea, 1 Cold., 175. The count of the indictment now in judgment, which charges the larceny does not conclude “against the peace and dignity of the State,'” and if it stood alone, would be bad for want of the proper conclusion. But the last count does have the proper conclusion; and we hold this to be sufficient, and that the conclusion “against the peace and dignity of the State” in the last count, relates to all other preceding counts. And in this case, the verdict is general; and even if one count were fatally defective, the established rule here, as in in England, is, that at common law, upon a general verdict of guilty upon an indictment containing several counts, where some are good and others bad, the Court will pronounce judgment upon the good counts, upon the presumption that it was to the good counts the verdict attached: 2 Whart. Cr. L., § 3047. And such is now the provision of our statute upon the subject: Cole, 5217. This practice was sustained by this Court in the case of Isham v. The State, 1 Sneed, 113. This presumption of law, however, that the general verdict of guilty was responsive to the valid count, and not to the defective count, is not conclusive, but prima facie. In a case where the proof is fully set out in the Bill of exceptions, if it be clear upon the facts that the verdict is not responsive to the valid count, presumption would fail, and upon such a conviction, the judgment should be arrested. In this case, we can not say upon the facts that the verdict specially attaches to the count alleged to be bad for want of the proper conclusion, and therefore the presumption of law *223 would relieve us of all difficulty on that question, even if we held the exception fatal.
We think there was error in the ruling of the Court, in disallowing the prisoner’s demand for the production and reading of the money orders referred to in the proof, These papers being in court, andi in the hands of the witness, and being an important' link in the chain of testimony against the prisoner, he had a right to criti-cise and test their identity as well as their value. In the case of Pyland v. The State, it was held that, if any question be made as to the genuineness of the bank notes alleged to have been stolen, the Court should require the prosecutor to produce the notes, if in his possession. If he fail to produce them when required, it will be a strong circumstance in favor of' the prisoner; 4 Sneed, 357.
The confession of the prisoner was evidently and clearly superinduced by the fear of a prosecution or the hope of a reward. Though-he does not confess himself guilty- — and though it be the general rule that confessions must be taken all together — yet, in view of the manner in which the stolen property was concealed, the confession under the circumstances, if unexplained, covers the prisoner with a fatal suspicion. It is a familiar rule of criminal evidence, that though a confession be improperly ■ obtained — -as by hope of reward or threats of punishment — yet, if important facts be discovered by it, so much of it as discovers said facts is admissible: Deathridge v. State, 1 Sneed, 75. And a good illustration of this rule is given in the case of Hudson v. The State, 9 Yer., 408, where it is held, that if the *224 prisoner in an improper confession, point out the place where the stolen property is found, the presumption of guilt arises against him, and tbe burthen of proof devolves on him to reconcile his knowledge wi1h his innocence: 2 King’s Nig., 151. The reasons for excluding confessions of guilt when made under stress of improper influence, as by threats or promises, is the great probability of their being untrue. In Deathridge’s case it is said, that, in such ease, it is competent to prove that the ju’isoner stated or pointed out the place, and the goods were found there. But it is not competent to prove further, that the prisoner said he put the goods there. This case is supported by the ancient authorities on this subject. Thus it is said, that although a confession obtained by means of promises or threats can not be received; yet if, in consequence of that confession, certain facts tending to establish the guilt of the prisoner, are made known, evidence of these facts may be received: Roscoe Cr. Ev., 50; Com’l. v. Knapp, 9 Pick., 496; State v. Crank, 2 Bailey, 67. A. fact, it is said by the court, in 1 Leach, 264, if it exists at all, must exist in the same manner, whether the confession from which it is derived, be in other respects true or false. Facts thus obtained, however, must be fully and satisfactorily proven, without calling in the aid of any part of the confession from which they have been derived. The most that is proper, said Mr. East, to be left to the jury in such case, is the fact of the witness having been directed by the prisoner where to find the goods, and his having found them accordingly; but not the acknowledgment of the prisoner having *225 stolen or put them there, which is to be collected or not from all the facts in the case: 2 East’s P. C., 658. Such a confession, it is said, may be evidence only of the fact that the prisoner wás acquainted with the other fact which he disclosed; and that so far as such knowledge goes, it is evidence to convict him of the offense. The leading case of 'Warickshall, so often referred to in the books, was very similar to the case now in judgment. The prisoner was indicted as receiver of stolen goods, and in consequence of promises of favor, made a full confession; and according to that confession, the property was found at her lodgings concealed between the sackings of her bed. It was held, the evidence of the finding was admissible: 1 Leach, 263; Roscoe Cr. Ev., 51. Applying these principles to the case in judgment, we hold, that so much of the statement of the prisoner as disclosed the place of concealment of the property, was very properly admitted to the jury, the same being found to be true, by finding the property in the place designated by him. The statement, however, expressly disclaims and denies all guilt in the premises, and the only feature of it that could be of value to the prosecution, is the discovery of the important fact, that the prisoner himself had concealed the goods, and that the statement has discovered the place of their concealment. And these are circumstances which may well be considered by the jury against the prisoner, in the absence of any satisfactory explanation. The burthen of proof is upon the prisoner now, to reconcile his knowledge with his innocence.
We come to consider and dispose of the last excep *226 tion in the case, as presented in the argument. The court charged the jury, after fully and correctly charging the law upon all other points involved, that, “if the prisoner received the property, knowing it to be stolen, he was guilty of a crime.” The prisoner had a right to a full exposition of the law upon this subject, and a full definition of the offense of receiving stolen goods. The mere receipt of stolen goods, knowing them to be stolen, is not of itself a crime. For such receiving may be for the most honorable purposes. The essence of the offense is, that the receiving of stolen goods knowing them to have been stolen, is accompanied by fraudulent intent to deprive the true owner thereof. This is the offense, and it must be thus charged in the indictment, as it is in this ease, and it must be shown in the proof by such circumstances as leave no reasonable doubt of the guilty knowledge. Unless there be evidence showing this knowledge, either direct or circumstantial, the prosecution must fail: Vide Bedford v. State, 5 Hum., 552; Hurell v. State, 5 Hum., 68; Wright v. State, 5 Yerg., 154; Cassels v. State, 4 Yerg., 149.
We hold, therefore, that the court erred in this portion of the charge to the jury; and for this and other causes herein indicated, the judgment is reversed, and the case remanded for a new trial.